IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

No. 18-0446

**FILED**
**March 4, 2019**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

In re A.N. and C.N.

Appeal from the Circuit Court of Hampshire County
The Honorable C. Carter Williams, Judge
Abuse & Neglect Case Nos.:  16-JA-100 and 16-JA-101

AFFIRMED, IN PART; REVERSED, IN PART, AND REMANDED
FOR FURTHER PROCEEDINGS

Submitted: January 15, 2019
Filed:  March 4, 2019

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Kingwood, West Virginia
Counsel for Petitioner

Joyce E. Stewart, Esq.
Moorefield, West Virginia
Guardian ad Litem

Patrick Morrisey, Esq.
Attorney General
Lee Niezgoda, Esq.
Assistant Attorney General
Fairmont, West Virginia
Counsel for Respondent
 Department of Health and
 Human Resources

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.    "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.    "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

3.    "'Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be

i

substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser.' Syl. pt. 3, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993)." Syl. Pt. 5, *In re Taylor B.*, 201 W. Va. 60, 491 S.E.2d 607 (1997).

4.      "'[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

5.      "In cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child." Syl. Pt. 6, *In re Timber M.*, 231 W. Va. 44, 743 S.E.2d 352 (2013).

6.      "In a proceeding to terminate parental rights pursuant to W. Va. Code [ §§ 49-4-601 to -610 (2015 & 2018 Supp.)], as amended, a guardian *ad litem*, appointed pursuant

to W. Va. Code [§ 49-4-601(f)], as amended, must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children. This duty includes exercising the appellate rights of the children, if, in the reasonable judgment of the guardian ad litem, an appeal is necessary." Syl. Pt. 3, *In re Scottie D.*, 185 W. Va. 191, 406 S.E.2d 214 (1991).

7.    "It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives." Syl. Pt. 3, *James M. v. Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

Workman, Justice:

In this appeal of the March 30, 2018, order entered by the Circuit Court of Hampshire County, West Virginia, the petitioner, C.N.,[1] who is the father of a daughter, A.N., and a son, C.N., argues that the circuit court erred in terminating his parental rights to A.N., when he was otherwise deemed a fit parent suitable to care for C.N. Upon review of the parties' briefs and arguments, the appendix record, and all other matters submitted before the Court, we find no error in the circuit court's decision to terminate the petitioner's parental rights to his daughter and, therefore, affirm the circuit court's order on that issue. But we recognize plain error in the circuit court's decision to return C.N. to the petitioner's "care, custody, and control" and, therefore, reverse the circuit court's decision and remand this case to the circuit court for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

On December 30, 2016, the Department of Health and Human Resources ("the DHHR"), filed an abuse and neglect petition against V.N., the mother of A.N. and C.N.,[2]

---

[1]Because this case involves sensitive facts, we protect the identities of those involved by using only the parties' initials. *See State ex rel. W. Va. Dep't of Human Servs. v. Cheryl M.*, 177 W. Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987); *see also* W. Va. R. App. P. 40. Further, the petitioner and his son, who is the subject of this appeal, have the same initials; we refer to the father as "the petitioner."

[2]V.N. voluntarily relinquished her parental rights to A.N. and C.N. and is not the subject of the instant appeal. According to the DHHR in its brief, the petitioner and the mother are separated but remain legally married.

1

and the petitioner alleging that they were abusive parents to their children,[3] A.N. and C.N. That allegation stemmed from the mother crashing her car while under the influence of drugs. A.N., who was five years old at the time of the accident and a passenger in the mother's vehicle, was not in a car seat or a booster seat, but was wearing a seatbelt.[4] The DHHR also alleged facts indicating that the petitioner failed to protect his children from the mother's drug abuse. The petitioner allegedly knew of the mother's drug abuse and still allowed her to care for and transport the children in the car.[5] The children were removed from the home and placed into foster care.

At the adjudicatory hearing that occurred on February 16, 2017, the petitioner stipulated to failing "to protect and ensure for the safety and well-being" of his children and,

---

[3]There was an older child, also with the initials C.N. ("older C.N."), who was the subject of the original petition. This child, however, has reached the age of majority and is no longer subject to this proceeding.

[4]A.N., who is eight years old, is severely disabled due to tuberous sclerosis, a disease that causes seizure disorders and blindness. According to the guardian ad litem, the child suffers from an unspecified intellectual disability, developmental delays and hypermetropia. Her mentality is that of a two-year-old child.

[5]The DHHR also alleged in the petition a history of investigations by Child Protective Services ("CPS") involving the petitioner, the children's mother and the petitioner's ex-wife, which included the petitioner getting into a fight and being stabbed in the presence of older C.N.; the younger C.N. having bruises; the mother being in and out of the home due to being incarcerated; the mother being nonresponsive to calls from school about the children or the mother not being able to be aroused by school workers at her home when she did not pick up A.N. from the school bus; the mother failing to pick up the younger C.N. at the bus stop; the petitioner being at work and unreachable; and, the petitioner being informed of the mother's failure to pick up the younger C.N. and taking no action.

placing them "in imminent danger of abuse and neglect by leaving them in the care of . . . [their] Mother . . . when he knew or should have known that she was abusing drugs and/or alcohol." The circuit court adjudicated the petitioner as an abusing parent and granted his request for a post-adjudicatory improvement period.

During the post-adjudicatory improvement period, the petitioner participated in parenting and adult life skills training, as well as undergoing a parental fitness evaluation at the request of the DHHR on May 17, 2017. The prognosis made by the psychologist who evaluated the petitioner was that he

> appears to be overly fixated on the well-being and actions of his wife, as opposed to focusing on what tasks he needs to complete in order to regain custody of his children. He has failed in the past to serve in a protective role by ending his relationship with his wife or preventing her from having contact with the children, thus exposing them to ongoing neglect. It is questionable as to whether or not he would be able to follow through with a decision to separate from his wife or maintain distance from her in the future. For that reason, a fair, but guarded prognosis is offered.

Approximately five months later, the Multi-Disciplinary Team ("MDT") agreed to reunification of the petitioner with his children. By August 15, 2017, following a gradual transition, the children were placed back in the petitioner's home.

By August 21, 2017, within one week of the children's reunification with the petitioner, a daycare worker for A.N. reported to the CPS that the child had extensive

3

bruising to her backside, from her buttocks to the thigh area, which appeared, in part, to be the form of a handprint. The bruising was described by the CPS worker as dark purple and blue. Both A.N. and C.N. were immediately removed from the petitioner's home.[6]

C.N. and A.N. were interviewed at the Child Advocacy Center ("CAC") on August 23, 2017. According to the record, A.N. was unable to communicate sufficiently with the interviewer, due to her disabilities. C.N. told the interviewer that A.N. gets in trouble "[f]or doing bad stuff[,] [l]ike hitting" and gets spanked "easily with a hand." When discussing touches, C.N. indicated that he liked being touched on his hand and being hugged. The interviewer asked him whether A.N. had ever gotten a touch that hurt and C.N. answered: "On her butt, I saw a big scratch on her butt, but I don't know where it came from and Dad doesn't know either." When asked to describe the mark, C.N. said, "It looked pretty bad." C.N. stated that he had seen the "scratch" on A.N.'s butt during the daytime at the babysitter's house.[7]

On August 26, 2017, after being returned to foster care, C.N. told his foster

_____

[6]Pamela Spiker, a foster-care provider who had previously provided care to A.N., described the photograph of A.N.'s bruising as "a little excessive" and also stated that the description of the bruising "seems extreme to me" in light of what she observed A.N. would sometimes receive during normal activities while the child was in her care.

[7]The circuit court found that "the only persons present in the home during the time that . . . [A.N.] was injured w[ere] her siblings . . . and the . . . [petitioner]." There was no evidence that even suggests that the injury occurred while A.N. was with the daycare worker.

mother that he had touched A.N. inappropriately in the past and said he could do the same thing to his younger foster siblings because they cannot talk to anyone. There were other prior incidents reported regarding C.N. while he was in foster care, which included the child reportedly putting his head on his foster sister's private parts and "trying to eat" the child and trying to take a foster sister's clothes off to "eat her down there." Also, C.N., on a different occasion, had handcuffed his blind foster brother to a bed in the middle of the night.[8]

At a status hearing conducted on September 19, 2017, the circuit court found that it was in the children's best interest to remain in the custody of the DHHR. The circuit court further found that there existed "imminent danger to [the] physical wellbeing of the minor children" and there remained "no reasonable, available, and less drastic alternatives to the removal of the minor children at the time." The circuit court also found that continuation in the petitioner's home was contrary to the children's welfare and best interests "due to the findings of abuse and neglect." The circuit court indicated that it would address in a separate order the parties' request for an order to evaluate C.N. due to the child's disclosures, which included an evaluation to determine whether the juvenile comports with the psychological behavioral profile of a child sexual abuser and/or victim.

By agreed order entered September 26, 2017, based upon allegations that C.N.

---

[8]C.N., who is nine years old, has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").

inflicted "Abuse – Sexual Abuse or Sexual Exploitation and Abuse – Mental or Emotional Injury" upon other children, the circuit court ordered an independent psychological evaluation "to determine . . . whether the juvenile comports with the psychological behavioral profile of a child sexual abuser and/or victim." The psychological evaluator, Dr. Timothy Saar, was also directed to provide recommended treatment and placement of the child "to meet any special needs determined as part of the evaluation."

On November 28, 2017, the DHHR filed revised case plans recommending termination of the petitioner's parental rights due to concerns for the safety of the children.

Dr. Saar evaluated C.N. on October 3, 2017. In a report dated December12, 2017, Dr. Saar concluded that C.N. was functioning in the very low range for IQ, but the IQ testing "appeared to be a low estimate of his ability due to his noncompliance and inability to concentrate throughout testing." Both C.N.'s foster father and teacher found C.N. to have "significant symptoms of Hyperactivity, Aggression, and Conduct Problems." C.N. denied that his father ever spanked or whipped him or his sister. This response was in conflict with what C.N. reported during his interview at the CAC. Significantly, Dr. Saar concluded:

> Although it is unclear on the specifics of the situation in the . . . [petitioner's] home, there are concerns about the lack of supervision along with the disciplinary procedures that are being followed. It is also concerning the number of CPS referrals this family has received along with two incidents implying . . . [C.N.] was being sexually inappropriate. [C.N.] . . . has exhibited sexually inappropriate behaviors and comments,

6

leading to his removal for inappropriately touching one of the foster children. Children who exhibit these kinds of behaviors and this level of knowledge of sexual matters have generally either been sexually abused or have been exposed to sexual materials. As there are indications of a lack of supervision in the home, [C.N.'s] . . . behaviors suggest he has either been sexually abused or exposed to inappropriate sexual materials, *raising concerns about him or other children being placed back in the home and put at risk for additional abuse.* Child[ren] who are sexually abused often perpetrate on each other and . . . [C.N.] presents a risk to other children in the home with him, particularly a home which has ineffectual supervision.

The family has had a number of CPS referrals and the allegations were mainly related to . . . [the mother] failing to perform her duties as a parent due to substance abuse and . . . [the petitioner] not being present in the home to supervise and provide care for the children. One of the children [older C.N.] indicated he was responsible for not only the other children's care, but also for protecting them from being in a vehicle with their mother. This is very concerning as children returning to this household without proof of significant change would be at a high risk for abuse and neglect. At this time, . . . [C.N.'s] prognosis is considered **poor**.

Based upon the foregoing conclusions, Dr. Saar recommended, inter alia, that C.N. not be left unsupervised and alone with any younger children, including his sister, A.N.; that C.N. "requires a structured, stable, and supportive home environment, offering consistent discipline and consequences for his behaviors, as well as consistent emotional support, and a stimulating environment[;]" that C.N. continue to receive individual therapy on a weekly to biweekly basis; and that C.N. could benefit from a psychiatric consultation for purposes of determining whether medication would help with his attention deficiencies.

The issue of the petitioner's disposition was the subject of hearings held by the circuit court on December 12, 2017, January 22, 2018, and February 5, 2018. Evidence introduced before the circuit court included testimony from Dr. Saar, the petitioner, a DHHR employee and a foster-care provider. Jessica Deardorff, a CPS worker with the DHHR, testified that she observed the bruising on A.N.'s lower thigh and buttocks, which was dark purple and blue with what appeared to be "a handprint or some kind of striping marks." Ms. Deardorff stated that A.N. was unable to say what happened to her. According to Ms. Deardorff, when she spoke with C.N., he did not tell her how A.N.'s bruising occurred. Ms. Deardorff also testified that when she told the petitioner about the bruising on A.N., he told her he did not know what had happened to A.N. Ms. Deardorff stated that no one has taken any responsibility for A.N.'s injuries.[9]

Testifying consistently with his written report, Dr. Saar stated that C.N. did not cooperate in the evaluation. The psychologist testified that he could not make an assessment concerning sexual abuse of or by C.N. He further stated that C.N. denied having ever been touched in any way or having touched anyone else inappropriately. According to Dr. Saar,

---

[9]The DHHR also presented evidence of A.N.'s "sexualized behavior." Ms. Deardorff testified that she had A.N. on a few occasions where the child exhibited sexualized behavior, which included the child lifting up her shirt while lying on the floor and trying to put her hands down her pants in the middle of a lobby. Also, A.N. had approached Ms. Deardorff and tried to lift up her shirt and then went for the button on her pants. These incidents occurred when A.N. was first removed from both the mother's and the petitioner's care and was placed at the West Virginia School for the Deaf and Blind after the abuse and neglect petition was filed. The DHHR was aware of the incidents and those incidents did not prevent the DHHR from returning A.N. to the petitioner's care and custody.

the child "appeared somewhat resistant to talk about that topic." He testified that C.N. required intense supervision, because the child's behaviors could place other children at risk of harm. Dr. Saar also indicated that C.N. should be evaluated by a psychiatrist to determine whether medication may be helpful for some of his attention issues. When questioned about A.N.'s injuries that she received within a week of being returned to the petitioner's custody, Dr. Saar stated that he did not recall being aware of those injuries at the time he evaluated C.N.[10] Dr. Saar did state that if it turned out the situation surrounding A.N.'s injuries was one where there was a need for supervision and there was a failure to supervise, then that would have impacted his opinion. Further, if it was a situation in which the parent caused the injury, the doctor stated that also could have impacted his opinion. As Dr. Saar testified, "if it was something done out of anger or poor impulse control and the child was hurt, then yes, we would have concerns about putting the child back in that parent's care depending on what that parent's rationale for that [was] . . . ."

Dr. Saar did diagnosis C.N. with "child neglect, ADHD, and oppositional[.]" The doctor did not feel that C.N. "was giving enough symptoms (inaudible) behaviors

---

[10]It is unclear from the appendix record whether Dr. Saar was provided with details surrounding A.N.'s injuries, which prompted removal of the children from the petitioner's custody, prior to his evaluation of C.N. There is some reference in Dr. Saar's report about A.N. having a scratch on her bottom that was observed by C.N. There is also reference in the report of C.N. being placed back into foster care in August of 2017 "after allegations of his father being physical with his sister." But there is no indication in the report that Dr. Saar was provided with complete, specific facts that led to A.N.'s and C.N.'s removal from the petitioner's care a week after reunification with the petitioner.

9

characteristic of those children that we know have [been a] child sexual abuse[r] or been the victim [of child sexual abuse]. It certainly doesn't rule it out." But Dr. Saar testified that C.N. refused to answer questions about that issue. Dr. Saar later testified that more information would have been helpful in determining whether C.N. comported with the psychological behavioral profile of a child sexual abuser or victim.[11] As the circuit court observed during the dispositional hearing:

> [W]e're asking Dr. Saar a lot of things that in fairness to him he hasn't been made aware of prior to today. So if we want him – you know, we want him to do an evaluation and give us his best shot at opinions and recommendations, he's done that, so in fairness to him if we want more from him then we need to start setting up our order asking for his evaluation in the parameters that we're asking so – and to give him the information he can do that on . . . .

Regarding placement of C.N. with the petitioner, the psychologist testified that he had just found out from the guardian ad litem the prior evening that the petitioner may be getting custody of C.N. as he "thought somebody else was taking the child." When asked by the circuit court to give an opinion as to whether C.N. should be placed with the petitioner, Dr. Saar declined, stating

> it was my understanding basically that the evaluation was to focus primarily on . . . [C.N.][;] . . . I feel like I would be overstepping my bounds in making a recommendation to return him to a home that I know nothing about from the direct source so I think I'm limited on what I can say about that particular

---

[11]The circuit court, in its final order, found that Dr. Saar's testimony "was limited to the needs of" C.N. and that the doctor "was not presented with all the pertinent information in this case."

home until I can get some more information. I would be happy to review any additional information –

When asked a second time by counsel for the DHHR as to whether he could make a recommendation about whether C.N. should be placed back in the home, Dr. Saar reiterated his prior testimony, stating

I feel like it would be unethical for me to make a comment about that home. . . . [T]o make a specific recommendation like he should return to his father, I don't really know much about . . . [the petitioner] (inaudible) besides what was in the records that we received. We could certainly render that opinion if the Court would like if we had more information or even the opportunity to meet with . . . [the petitioner].

The petitioner also testified at the hearing that the only thing he could think of that caused A.N.'s bruising was him helping her into bed one time. The petitioner acknowledged that the photo of A.N.'s injury, which was introduced in evidence during the hearing, looked bad, but that "he had no idea about it" as A.N. never cried. The petitioner denied that he ever spanked A.N. But he later admitted to accidentally injuring A.N. when he helped to lift her into bed. The petitioner also testified that he would enlist the help of his ex-wife, who was not A.N.'s and C.N.'s mother, in caring for the children if they were returned to him. During the hearing, however, there was testimony about his ex-wife having a substantiated history with CPS surrounding domestic violence in the presence of her children (not the children involved in this case).

11

Significantly, during the hearing that occurred on February 5, 2018, the DHHR recommended the termination of the petitioner's parental rights as to both children. The guardian ad litem ("GAL") recommended termination of the petitioner's parental rights as to A.N. and that C.N. be transitioned back to the petitioner's home with services to address C.N.'s needs.

By order entered on March 30, 2018, the circuit court terminated the petitioner's parental rights as to A.N. and ordered that the petitioner retain his parental rights as to C.N., with reunification to proceed following C.N.'s completion of treatment as recommend by Dr. Saar in C.N.'s psychological evaluation. The circuit court made findings wherein it recognized that both A.N. and C.N. had engaged in conduct of a sexual nature. The circuit court found that A.N's injuries were nonaccidental and the petitioner's explanation of those injuries was inconsistent with the severity of the injuries and "simply not reasonable, plausible, or credible in the light of the extent of the injuries that she sustained." The circuit court also found that the petitioner "has not acknowledged the extent of the injuries sustained by the minor child, [A.N.] . . . ." The circuit court then found that the petitioner

> was afforded more than ample opportunity to explain the nature, circumstances and mechanism causing the child's injuries, however this Court determines that the . . . [petitioner's] explanation and description of how the child's injuries occurred do not satisfy common sense or experience, and the child's injuries are indicative of non-accidental means. *This Court was frankly hopeful that the . . . [petitioner] would articulate the*

12

*genuine cause of this child's injuries; without such this Court now finds itself in a posture where this child's safety and welfare would be compromised and at risk were this Court to return the child to her father's custody and care.*

(Emphasis added). While this finding was focused on A.N., the circuit court made the following three critical findings that were specifically applicable to both A.N. and C.N.:

41. *The Court FINDS that to grant the . . . [petitioner] a Disposition Improvement Period would be an exercise in futility at the children's expense in this matter*, given the special needs of the minor child . . . [A.N.] and ongoing treatment needs of the minor child, . . . [C.N.]

42. *The Court FINDS that despite the . . . [petitioner] being afforded a post-adjudicatory improvement period, he has displayed little insight into underlying issues which gave rise [to] the Court's findings of abuse and/or neglect. The . . . [petitioner's] ongoing lack of insight also place said children's safety and welfare at risk.*

43. *The Court FINDS that the . . . [petitioner] has failed to acknowledge the existence of the problems in this case, which renders the problems untreatable.*

(Emphasis added). Notwithstanding these findings, the circuit court determined that termination of the petitioner's parental rights to A.N. was necessary and in the child's best interest,[12] but that it was in C.N.'s best interest "to be transitioned into the care, custody, and

---

[12]The circuit court ordered post-termination visitation between A.N. and the petitioner. The DHHR stated in its appellate brief that after the first post-termination visit, A.N. exhibited concerning behaviors including slamming a dog's tail in a door so hard the tail had to be amputated, repeatedly calling herself an idiot, refusing to eat and spitting food. Due to these behaviors, the petitioner's visits with A.N. were suspended. The most recent status update filed by the DHHR indicates that A.N. began residing with her paternal grandmother in North Dakota on October 16, 2018, with the DHHR retaining legal custody. The current permanency plan is for adoption by the paternal grandmother with continued post-termination contact with the petitioner. The petitioner has engaged in video calls with his daughter and visited with her over Christmas under the supervision of the paternal

(continued...)

control" of the petitioner.[13]  The circuit court found it necessary to separate the siblings and that it was not in their best interests to be returned to the petitioner's home together.[14]  It is from this order that the petitioner appeals the termination of his parental rights to A.N.

## II.  Standard of Review

This Court applies the following standard of review to dispositional determinations made by the circuit court in abuse and neglect cases:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected.  These findings shall not be set aside by a reviewing court unless clearly erroneous.  *A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.*  However, a reviewing court may not overturn a finding simply because it would have decided the case

---

[12](...continued)
grandmother.

[13]According to the status update filed by the DHHR and the petitioner, C.N. has been transitioned back into the petitioner's custody.  The GAL did not mention C.N.'s status in the most recent reports submitted to this Court.

[14]Even though not assigned as error, we find the circuit court correctly decided that it was in both children's best interest to separate the siblings in light of the evidence regarding C.N.'s behavior and Dr. Saar's recommendation that he not be in the same home with younger children.  *See* Syl. Pt. 4, *In re Carol B.*, 209 W. Va. 658, 550 S.E.2d 636 (2001) (recognizing statutory sibling preference, but that it can be disregarded where circuit court determines, by clear and convincing evidence, that placement of child with sibling is not in best interest of one or more children).

differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996) (some emphasis added). We are further guided in our review of abuse and neglect cases by the polestar of what is in the child's best interest, having held in syllabus point three of *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996), that "[a]lthough parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." It is under this standard of review that we examine the parties' arguments.

## II. Discussion

The issue raised by the petitioner is whether the circuit court erred in terminating his parental rights to A.N. "when he was otherwise found to be a fit parent through reunification with" C.N. The petitioner first argues that the circuit court found him to be a fit parent and that the "no reasonable likelihood" test set forth in West Virginia Code § 49-4-604 (b) (2018 Supp.) was not met because the circuit court placed C.N. back in his care. Consequently, the petitioner contends that the circuit court erred by terminating his parental rights to A.N. He asserts that there should have been a different disposition for A.N. short of termination of his parental rights, for instance placing his daughter into the custody of a "suitable caretaker," such as a guardianship with another person or entity.

15

Conversely, the DHHR argues that the circuit court did not err in terminating the petitioner's parental rights to A.N., because it was in her best interests as her safety could not be assured under the petitioner's care. The DHHR argues that the circuit court's denial of other dispositions was proper in light of A.N.'s injuries and the petitioner's inability to reasonably explain those injuries that occurred after the return of A.N. to his care for one week following a post-adjudicatory improvement period. *See* Syl. Pt. 2, *In re Scottie D.*, 185 W. Va. 191, 406 S.E.2d 214 (1991) ("Termination of parental rights of a parent of an abused child is authorized under W. Va. Code, 49-6-1 to 49-6-10,[15] as amended, where such parent contends nonparticipation in the acts giving rise to the termination petition but there is clear and convincing evidence that such nonparticipating parent knowingly took no action to prevent or stop such acts to protect the child. Furthermore, termination of parental rights of a parent of an abused child is authorized under W. Va. Code, 49-6-1 to 49-6-10, as amended, where such nonparticipating parent supports the other parent's version as to how a child's injuries occurred, but there is clear and convincing evidence that such version is inconsistent with the medical evidence." (footnote added)).

Pursuant to West Virginia Code § 49-4-604(b)(6),

[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare

---

[15]The abuse and neglect procedural statutory scheme was amended and reenacted by the Legislature in 2015 and is now codified as West Virginia Code §§ 49-4-601 to -610 (2015 & 2018 Supp.).

16

of the child, terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent and commit the child to the permanent sole custody of the nonabusing parent, if there be one, or, if not, to either the permanent guardianship of the department or a licensed child welfare agency.

The statute further provides that

"no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help. Those conditions exist in the following circumstances, which are not exclusive:

. . . .

The abusing parent or parents have not responded to or followed through with a reasonable family case plan or other rehabilitative efforts of social, medical, mental health or other rehabilitative agencies designed to reduce or prevent the abuse or neglect of the child, as evidenced by the continuation or insubstantial diminution of conditions which threatened the health, welfare or life of the child . . . .

*Id*. § 49-4-604(c)(3). Finally, this Court has held that:

"Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." Syl. pt. 3, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 5, *In re Taylor B.*, 201 W. Va. 60, 491 S.E.2d 607 (1997).

17

Based upon a review of the record, the circuit court found that the petitioner's explanation of the circumstances of A.N.'s nonaccidental injury to her thigh and buttocks was not credible; that the petitioner's failure to explain the cause of A.N.'s injuries placed A.N.'s "safety and welfare" at risk if the court were to return her to the petitioner's custody and care; that the petitioner had failed to recognize the problems in the case, rendering the problems "untreatable;" and that the petitioner's "ongoing lack of insight" placed his children's "safety and welfare at risk." These findings emanate not only from the unexplained injury to A.N., but also from the petitioner's testimony that he planned to have his ex-wife, who has a substantiated history with child protective services, to move into his home to help care for his children. The evidence offered fully supports the circuit court's findings that the petitioner does not or will not recognize his failings when it comes to protecting the safety and welfare of his children. Without recognition of the problems, the circuit court correctly found that the problems were not treatable. We, therefore, find that the circuit court had sufficient evidence upon which to find there was no reasonable likelihood the petitioner could substantially correct the conditions of abuse and neglect, warranting termination of his parental rights to A.N. *Id.* The termination of his parental rights was in the best interests of A.N. *See In re Katie S.*, 198 W. Va. at 81, 479 S.E.2d at 591, Syl. Pt 4.

We further reject the petitioner's argument that he should have been granted a post-termination improvement period before his parental rights were terminated simply

18

because he had filed a motion for one, indicated he would participate fully in one if granted, and argued there had been a substantial change in circumstances justifying a second improvement period.[16] *See* W. Va. Code 49-4-610(3)(A), (B) and (D) (relating to improvement periods in abuse and neglect cases and establishing that circuit court "may" grant post-dispostional improvement period where respondent moves in writing for improvement period, respondent demonstrates by clear and convincing evidence that he or she "is likely to fully participate in improvement period" and respondent "has experienced a substantial change in circumstances" if not the first improvement period granted by the circuit court). The DHHR counters that the circuit court correctly denied the petitioner's motion for a post-dispositional improvement period, because after complying with his first (post-adjudicatory) improvement period, within one week of reunification with both of his children, A.N. suffered from a nonaccidental injury for which the petitioner failed to explain and/or take responsibility.

> We have previously held that
>
> "[c]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous

---

[16]According to the petitioner, the change in circumstances stems from the "newly-discovered [sic] treatment needs of both children, and the time it would take to integrate a care-taking plan in light of that new information."

19

placements." Syl. Pt. 1, in part, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 4, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). Based upon the facts before us, the circuit court did not err in terminating the petitioner's parental rights without affording him a post-dispositional improvement period.[17]

Having concluded that termination of the petitioner's rights to A.N. was appropriate, we are left with an issue not raised by the parties to this appeal – whether the circuit court was correct in its decision to allow the petitioner to retain his full parental rights to C.N. As we held in syllabus point six of *In re Timber M.*, 231 W. Va. 44, 743 S.E.2d 352 (2013),

> [i]n cases involving the abuse and neglect of children, when it appears from this Court's review of the record on appeal that the health and welfare of a child may be at risk as a result of the child's custodial placement, regardless of whether that placement is an issue raised in the appeal, this Court will take such action as it deems appropriate and necessary to protect that child.

*Accord* Syl. Pt. 8, *In re Lilith H.*, 231 W. Va. 170, 744 S.E.2d 280 (2013). We further stated that

---

[17]We likewise reject the petitioner's argument that the circuit court should have placed A.N. "into the custody of a suitable caretaker without terminating the Petitioner's parental rights to her[.]" Like the petitioner's argument for a post-dispositional improvement period, this argument is based upon the premise that there is a reasonable likelihood the petitioner could substantially correct the conditions of abuse and neglect. The circuit court, however, rejected this premise when it found the petitioner's problems were not correctable. This Court agrees with the circuit court's findings on this issue.

> [s]uch action may include vacating the circuit court's order of
> disposition with respect to the custodial placement, remanding
> the case for further proceedings, and directing the entry of an
> order fully explaining the propriety of the custodial placement.
> The thoroughness of such an order becomes extremely important
> if a circuit court were to determine on remand that its initial
> custodial placement was, in fact, appropriate.

*In re Timber M.*, 231 W. Va. at 60, 743 S.E.2d at 368. This Court's recognition that

sometimes there is a need to sua sponte apply the plain error doctrine[18] in cases involving

issues that directly impact the safety and welfare of a child emanates from our significant

body of case law directing our decisions be guided by the child(ren)'s best interest and our

duty to safeguard the child(ren). As we stated in *In Timber M.*, "it is clear from our [child

abuse and neglect] procedural rules, as well as our prior case law, that '[t]here cannot be too

much advocacy for children.' *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 570, 490

S.E.2d 642, 657 (1997) (Workman, C.J., concurring)." 231 W. Va. at 59, 743 S.E.2d at 367.

Succinctly stated, it is virtually impossible to "conceive of a case more appropriate for the

exercise of our authority to notice plain error 'in the interest of justice' than one in which

children may [be] in danger as a result of an inappropriate placement." *Id*. at 63, 743 S.E.2d

at 371 (Workman, J., concurring).

_____

[18]*See* Syl. Pt. 2, *In re K.L.*,233 W. Va. 547, 759 S.E.2d 778 (2014) ("'[This Court] may, sua sponte, in the interest of justice, notice plain error.' Syl. pt. 1, in part, *State v. Myers*, 204 W.Va. 449, 513 S.E.2d 676 (1998)."); Syl. Pt. 3, *In re K.L.*, 233 W. Va. at 449, 759 S.E.2d at 780 ("'To trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.' Syl. pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).").

21

Applying the foregoing principles, we undertake an examination of the circuit court's decision to transition C.N. back into the petitioner's custody. Our focus on the circuit court's order is two-fold. First, we address the inconsistencies between the factual findings made by the circuit court and the conclusions reached based upon those findings. The circuit court made specific findings regarding the petitioner's failure to recognize his problems as a parent, the petitioner's failure rendering the problems untreatable, the petitioner's "ongoing lack of insight . . . plac[ing] . . . [his] children's safety and welfare at risk[,]" and the grant of a post-dispositional improvement period being "an exercise in futility at the children's expense given the special needs" of A.N. and the "ongoing treatment needs of C.N." The circuit court also found that the petitioner had admittedly injured A.N., but was unwilling to recognize and take responsibility for the injury. Based upon these findings, the circuit court terminated the petitioner's parental rights to A.N., then inexplicably concluded that these precise findings did not require a termination of the petitioner's parental rights to C.N. We are befuddled by these conclusions which are totally inconsistent with the dispositions, with neither reasoning nor examination of relevant case law.

As this Court has previously found,

'[i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.'

22

*In re: Charity H.*, 215 W. Va. 208, 217, 599 S.E.2d 631, 640 (2004) (quoting *W. Va. Dept. of Health and Human Res. v. Doris S.*, 197 W. Va. 489, 498, 475 S.E.2d 865, 874 (1996)). Moreover, as previously mentioned concerning the termination of the petitioner's parental rights to A.N., circuit courts are directed by West Virginia Code § 49-4-604(b)(6) to terminate an abusing parent's parental rights "[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child. . . ." *Id*.; *see In re S.W.*, 233 W. Va. 91, 99-100, 755 S.E.2d 8, 16-17 (2014) (reversing circuit court's decision that child be reunited with father when "overwhelming evidence supported the termination of his parental rights[,]" stating that "[t]his Court has consistently articulated and adhered to the statutorily-mandated standard for the termination of parental rights. West Virginia Code § 49-6-5(a)(6)[19] authorizes the termination of parental rights '[u]pon a finding that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future and, when necessary for the welfare of the child.'" (footnote added)); *In re J.F.*, No. 12-1444, 2013 WL 2631307 (W. Va. June 12, 2013) (memorandum decision) (reversing circuit court's decision to terminate parental rights to J.F.'s older siblings, after circuit court determined that instances of abuse and neglect could not be corrected within a reasonable time, but allowing parents to retain their rights to eighteen-month-old J.F.); *In re Isaiah*, 228 W. Va. 176, 718 S.E.2d 775 (2010) (reversing and remanding circuit court's failure to terminate mother's parental rights where circuit court found that mother denied

---

[19]Now W. Va. Code § 49-4-604.

having a drug problem, had not corrected conditions of abuse and neglect, and return to mother's home was not in child's best interest). Here, the circuit court expressly found that the conditions of abuse exhibited by the petitioner could not be corrected and that the fact that the conditions were not treatable placed the safety and welfare of both children at risk. But despite our statutory and case law, which directs the circuit court to terminate a parent's parental rights under these circumstances, the circuit court's order is devoid of any findings or explanation supporting its decision not to terminate the parental rights to C.N. and to return C.N. to the petitioner.

We next address the lack of evidence before the circuit court and how that undermines its decision to return legal and physical custody of C.N. to the petitioner by first focusing on the circuit court's determination that simply treating C.N., as recommended by Dr. Saar, will implicitly resolve the issues surrounding the petitioner's parental fitness. The appendix record reveals that there was a complete lack of evidence introduced at the dispositional hearings that established the petitioner's parental fitness to parent C.N. As Dr. Saar testified, he was not asked to perform a parental-fitness evaluation of the petitioner and he was not provided with all the information needed to assess the petitioner's parental fitness

24

regarding C.N.[20]  The circuit court even made a specific finding that the doctor "was not presented with all pertinent information in this case."  In addition, there was a lack of factual development regarding why both A.N. and C.N. had exhibited sexualized behavior. Specifically concerning C.N, there was evidence presented that the child stated that he had inappropriately touched a foster sister and said that he could do the same to other younger children.  C.N. reportedly put his head on his foster sister's private parts when"trying to eat" the child and trying to take a foster sister's clothes off to "eat her down there." And C.N. handcuffed his blind foster brother to a bed in the middle of the night.  Dr. Saar testified that he was unable to gather information from C.N. about these instances and, therefore, the doctor was not able to make any conclusion as to whether C.N. had been a victim of sexual abuse or had perpetrated sexual abuse on other children.  Dr. Saar did testify, however, that because of the allegations, C.N. should not be in the same home as A.N., or any child that is younger and more vulnerable, "unless we can guarantee intense supervision . . . at least not in the short term."  As Dr. Saar stated in his written report:

> Children who exhibit these kinds of behaviors and this level of knowledge of sexual matters have generally either been sexually abused or have been exposed to sexual materials.  As there are indications of a lack of supervision in the home, . . . [C.N.'s] behaviors suggest he has either been sexually abused or exposed to inappropriate sexual materials, raising concerns about him or

---

[20]The prior parental fitness evaluation of the petitioner occurred months before the children's removal from the petitioner's home after reunification.  Further, information on neither A.N.'s injuries nor C.N.'s sexualized behavior was an issue at the time of the prior parental fitness evaluation, which was not performed by Dr. Saar.

other children being placed back in the home and put at risk for additional abuse.

The doctor further testified that more information would have been helpful in determining whether C.N. comported with the psychological behavioral profile of a child sexual abuser or victim. But the dispositional hearing bears no development of any facts about what may have caused the children, and particularly C.N., to exhibit this type of behavior. We, therefore, are left with a record before us with unresolved critical issues that undeniably impact whether return of C.N. to the petitioner's care and custody was appropriate for the child.

Finally, as an ancillary matter, we are troubled by the lack of advocacy on behalf of C.N. by both the GAL and the DHHR in light of the evidence and the findings made by the circuit court. There is no clear explanation offered by the GAL as to why returning custody of C.N. to the petitioner was warranted and in C.N.'s best interests, particularly in light of the circuit court's determination that the petitioner has problems that are untreatable and place both C.N.'s and A.N.'s safety and welfare at risk. The GAL indicated during the disposition hearing that she had "a bit of a problem there with separating . . . [C.N.] from his father[,]" and stated that C.N. is going to require "extensive treatment that may take months." The GAL also recognized that C.N.

> took another vulnerable child in a home and handcuffed or tied
> that child to a bed. His actions just speak to a lot of concerns
> psychologically in . . .[C.N.]; however, my hope was that . . .
> [the petitioner] with the devotion that he's shown to . . . [C.N.]

> going down to visit home, learning about his treatment, that in the future . . . [C.N.] could be placed back with his father so that he would have at least the comfort of one biological parent being available for his continued care.

This recommendation, however, ignores the significant problems of abuse and neglect exhibited by the petitioner, which led to the removal of both C.N. and A.N. from his home – twice. It also ignores the fact that the petitioner never accepted responsibility for the nonaccidental injury suffered by A.N. and the impact that failure has on C.N. if returned to the petitioner's custody. This Court has held:

> In a proceeding to terminate parental rights pursuant to W. Va. Code [§§ 49-4-601 to -610 (2015 & Supp. 2018)], as amended, a guardian *ad litem*, appointed pursuant to W. Va. Code [§ 49-4-601(f)], as amended, *must exercise reasonable diligence in carrying out the responsibility of protecting the rights of the children.* This duty includes exercising the appellate rights of the children, if, in the reasonable judgment of the guardian ad litem, an appeal is necessary.

*In re Scottie D.*, 185 W. Va. at 191, 406 S.E.2d at 214, Syl. Pt. 3 (emphasis added).

Likewise, even though the DHHR recommended termination of the petitioner's parental rights to both A.N. and C.N. at the final dispositional hearing, when the circuit court entered an order only terminating the petitioner's rights to A.N. and not C.N., there was nothing done by the DHHR to challenge that ruling. The DHHR recognized in oral argument before this Court that it had "grave concerns" about C.N. being returned to the petitioner's custody. Incongruously, the DHHR argues in its appellate brief in support of the circuit court's termination of parental rights as to A.N., but not C.N. The DHHR contends that the

27

circuit court was justified in rendering two different and separate dispositions for each child as "the court must look at the individual needs and best interests of each child under the facts and circumstances." The DHHR also argues that our law "requires that each child be evaluated separately to determine the risk of harm to each." Critically, the DHHR fails to offer any explanation for how returning C.N. to his father's custody is in the best interest of the child. *See In re Jonathan G.*, 198 W. Va. 716, 731, 482 S.E.2d 893, 908 (1996), *modified on other grounds as stated in State ex rel. C.H. v. Faircloth*, 240 W. Va. 729, 815 S.E.2d 540 (2018) (recognizing that "DHHR, as a party to this case . . . has the right and responsibility to advocate whatever position it determines proper under the law and in the best interests of the child.").

Our review of the appendix record leads us to the inescapable conclusion that the circuit court's order terminating the petitioner's parental rights to A.N., but not to C.N., contains critical inconsistencies between specific factual findings and the dispositions ordered. These inconsistencies must be resolved in a manner that complies with our statutes, *see* W. Va. Code § 49-4-604(b)(6), and relevant case law. Morever, the circuit court's order, as well as the appendix record, show that the circuit court was lacking important evidence necessary for determining the petitioner's parental fitness to parent C.N. Similar to our decision to reverse and remand in *In re Timber M.*, we are left "with the firm conviction" that no one adequately considered the petitioner's parental fitness to have custody of C.N. 231 W. Va. at 60, 743 S.E.2d at 368; *see also In re Emily*, 208 W. Va. 325, 339, 540 S.E.2d 542,

556 (2000) (reversing and remanding for final disposition of abuse and neglect by circuit court, finding, in part, that "in the context of abuse and neglect proceedings, the circuit court is the entity charged with weighing the credibility of witnesses and rendering findings of fact.").

We, therefore, reverse the circuit court's decision to allow the petitioner to retain full parental rights to C.N. and remand this case to the circuit court for further proceedings consistent with this opinion, including re-examining the disposition, establishing an intensive plan of therapy for this child, and directing the DHHR to monitor C.N.'s progress.

In reaching this decision, we remind the circuit court that it should begin by requiring monitoring of the petitioner's current custody of C.N. immediately. Additionally, any decision to remove C.N. will necessitate a gradual transition period for the child, given the emotional impact that comes from changing custody. As we have held:

> It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

Syl. pt. 3, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991). However, if this child remains in the physical custody of his father, the circuit court must see that he is protected. Moreover, if the circuit court determines that the petitioner's parental rights

29

should be terminated, it may direct post-termination visitation with C.N. if in the child's best interest. *See In re Emily*, 208 W. Va. at 343, 540 S.E.2d at 560 (recognizing that if circuit court finds sufficient emotional bond between respondent father and his children, but also concludes that parental rights should be terminated, that court can grant post-termination visitation children, provided such a continued relationship is in children's best interests and "'would not unreasonably interfere with their permanent placement.' *State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 260, 470 S.E.2d 205, 214 (1996)."). In the context of continued visitation the circuit court must determine whether such visits should be supervised.

## V. Conclusion

Based upon the forgoing, the order of the Circuit Court of Hampshire County is affirmed with regard to the termination of the petitioner's parental rights to A.N., but reversed and remanded with regard to C.N. for further proceedings consistent with this opinion. The proceedings regarding C.N. are directed to occur on an expedited basis. To facilitate the commencement of the proceedings on remand, the Clerk is directed to issue the mandate of the Court contemporaneously with the issuance of this opinion.

Affirmed, in part;
Reversed, in part, and remanded
for further proceedings.
