IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2019 Term

_____

No. 19-0331

_____

FILED

November 21, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES AND ERICA BRANNON GUNN,
GUARDIAN AD LITEM,
Petitioners

v.

THE HONORABLE LORA A. DYER, JUDGE OF THE CIRCUIT COURT OF
ROANE COUNTY; AND R.B. AND T.B.,
Respondents

_____

ORIGINAL PROCEEDING IN PROHIBITION
WRIT GRANTED

_____

Submitted:  September 4, 2019
Filed: November 21, 2019

Joshua W. Downey, Esq.
Roane County Prosecuting Attorney
200 Main Street
Counsel for Petitioner DHHR

Erica Brannon Gunn, Esq.
402 Market Street
Spencer, WV 25276
Guardian Ad Litem for A.N.B., N.B.B.
J.S.B., B.K.B., E.G.B., and A.D.M.

D. Kyle Moore, Esq.
P. O. Box 722
Ripley, WV 25271
Counsel for Respondent R. B.

Ryan M. Ruth, Esq.
418 Goff Mountain Rd., Suite 202
Charleston, WV 25313
Counsel for Respondent T. B.

JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE HUTCHISON, deeming himself disqualified, did not participate in the decision of this case.

SYLLABUS BY THE COURT

1.      "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight."  Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

2.      "As a general rule the least restrictive alternative regarding parental rights to custody of a child under W. Va. Code, 49-6-5 (1977) will be employed; however, courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully

i

committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, *In re R. J. M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980).

3. Compliance with the statutory requirements contained in West Virginia Code § 49-4-610 (2015) does not unconditionally entitle a parent to an improvement period. Only where such an improvement period does not jeopardize a child's best interests should one be granted and the circuit court's order granting an improvement period should set forth findings demonstrating the lack of prejudice or harm to the child.

3. "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va. Code, 49-6-5 [1977], may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993).

WORKMAN, J.:

Petitioners, West Virginia Department of Health and Human Resources ("DHHR") and Erica Brannon Gunn, guardian ad litem of the minor children A.N.B., N.B.B., J.S.B., B.K.B., E.G.B., and A.D.M. (collectively "petitioners"), seek an order prohibiting the Circuit Court of Roane County from granting a post-adjudicatory improvement period to respondent parents, R. B. and T. B ("respondents").[1] Petitioners assert that the circuit court erred in granting the improvement period by failing to consider the best interests of the children. Respondents maintain that they have demonstrated that they are likely to fully participate in an improvement period and the grant of such an improvement period does not jeopardize the children's best interests.

After careful review of the parties' briefs and oral arguments, the appendix record, and the applicable law, we find that the circuit court committed a clear legal error in misapprehending the evidence, failing to consider probative evidence, and failing to consider the best interests of the children. We therefore grant the writ of prohibition and remand this case to the circuit court for entry of an order terminating respondents' custodial and parental rights.

---

[1] Because this case involves minors and sensitive matters, we follow our longstanding practice of using initials to refer to the children and the parties. *See, e.g., State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

## I. FACTS AND PROCEDURAL HISTORY

On January 12, 2018, DHHR filed an abuse and neglect petition, requesting emergency custody due to the threat of imminent danger to the respondents' five adopted children and one foster child.[2] By order entered March 23, 2018, the circuit court denied respondents' individual motions for supervised visitation, a decision based on the *in camera* testimony of the children, all of whom the court deemed to be credible.

In relevant part, the children's testimony, as set forth in the circuit court's order, included allegations of physical and emotional abuse by respondent T. B., as follows: 1) she dragged E.G.B. by her hair to discipline her, as corroborated by B.K.B.; 2) she

---

[2] At the time the proceedings commenced, B.K.B. was six years old, A.N.B. was seven years old, N.B.B. was eight years old, J.S.B. was nine years old, and E.G.B. was eleven years old. A.D.M., the foster child, was thirteen years old. B.K.B. and A.N.B. are the "lowest functioning" children and most, if not all, have special needs in some degree or another.

The youngest five children had been adopted by respondents after being removed from their biological families on the basis of abuse and neglect. There is nothing in the record as to when the termination of the biological parents' rights occurred, when the children were originally placed with respondents, or when the adoption of the children was finalized. There is, however, indication that at least some of the children had been in multiple pre-adoptive homes before being adopted by respondents.

Further, the record establishes that at some point before the instant petition was filed, respondents had custody not only of the six children involved in this case but also two other children, a second foster child—S. T. (discussed in greater detail *infra*) and a kinship placement. The record is silent as to the disposition of the second foster child, while the child who was residing with respondents as a kinship placement was removed at some point because DHHR's rules only allow a certain number of children to be placed in a home.

2

locked at least two of the children[3] inside their room each night, beginning at 7:00 p.m., but would "smack" any of the children if they got out of bed; the two who were locked in nightly testified they urinated on themselves if they had to use the bathroom in the middle of the night; 3) she hit the children with a belt or a metal spatula and "tr[ied] her best not to leave bruises or marks"; 4) she threatened on more than one occasion to "snap [N.B.B.'s] neck if she did not listen," as corroborated by B.K.B, and J.S.B.; 5) she held N.B.B.'s head under water in the bathtub in order to make her "pay attention"; 6) she forcibly put medication, occasionally excessive, in E.G.B.'s mouth when she resisted; and 7) she forcibly "ripped" E.G.B.'s clothing off, causing her to stand naked in the kitchen, as corroborated by J.S.B. Significantly, the children further testified that T.B. instructed them not to talk to certain administrators and teachers at their school about what was going on in the home, instructed them on what to say and what not to say to CPS workers, and told them that CPS would not believe adopted children if their accounts differed from the parents' accounts.

As to respondent R.B., the children testified that he drank a substantial amount of alcohol every night, resulting in frequent loud, sometimes physical, and often threatening arguments between him and T.B., which frightened the children. The eldest child testified that he did not feel safe in the home when the arguments got "really loud"

---

[3] J.S.B. testified that all but A.D.M. were, at some point in time, locked in their rooms "with chains so they couldn't get out."

and that occasionally, respondents would threaten to kill each other. J.S.B. testified that R.B. hit T.B. in the arm and T.B. threw a chair at R.B. during one such argument. R.B. allegedly broke a television set during one such argument. [4]

Additionally, the children testified that three of them—A.N.B., B.K.B. and A.D.M.—were considered the "good children," while N.B.B., J.S.B. and E.G.B.[5] were considered the "bad children" and were subjected to harsher discipline, deprivation of food, and spartan living conditions with far less clothing and far fewer toys and personal belongings. The children expressed concern that T. M. would "be mad" for disclosing the incidents and their reluctance to return to the home because "they're mean."

The two eldest children—A.D.M. and E.G.B.—indicated they neither wanted visitation with respondents, nor to return to the home. N.B.B. indicated she would like to visit with respondents, but did not ultimately want to return to the home. Two of the younger boys—J.S.B. and B.K.B.—however, indicated they would like to visit with

---

[4] R. B. disputed that this occurred during an argument and that it was simply an accident. However, as discussed more fully *infra*, he disputed most of the allegations made by the children.

[5] E.G.B., J.S.B., and N.B.B. are biological siblings and, although the record is non-specific, they are the three generally characterized as having "behavioral issues" and ADHD.

4

and return to respondents.  The circuit court found that A.N.B.'s "cognitive limitations" made her responses in this regard unreliable.

Adjudicatory hearings were conducted on May 31, 2018 and June 19, 2018. CPS representative Tasha Ruppert testified regarding what she characterized as "profound abuse and neglect" of the children.[6]  She characterized the children's demeanor as "terrified" when they spoke with her, due to T. M.'s threats about disclosing the abuse to CPS.  She noted that the children became more forthcoming after they were assured they were not returning to the home.  She described her inspection of the locks on the outside of the bedroom doors and that the shared bedroom of E.G.B. and N.B.B. was relatively "bare" without clothing, toys, or comfort items; in contrast, A.N.B.'s room was filled with clothing and toys, consistent with the markedly disparate treatment described by the children.[7]

DHHR case worker, Jessica Bailey, also testified at the adjudicatory hearing. She testified that services had not been offered to respondents because "they have said that they do not think they did anything wrong."  Ms. Bailey further testified that she became aware that respondents had previously put in their "ten day notice" to return certain of the

---

[6] Ms. Ruppert's testimony regarding the children's allegations was consistent with their *in camera* testimony to the circuit court.

[7] Consistent with this observation, Ms. Ruppert testified that upon sending items for the children upon removal, A.N.B. had "bags and bags" of things sent, whereas E.G.B. and N.B.B. "shared a half filled trash bag worth of items for them."

children after they were initially placed. However, they rescinded their notice after being advised that no further children would be placed with them if they did so. She agreed that certain of the children were known to have behavioral problems and continued to exhibit those in their post-removal placements. However, she testified that the children were all doing well in their current placements as of the date of the hearing.[8]

Finally, respondents testified on their own behalf, but denied virtually the entirety of the children's allegations.[9] R. B. admitted to locking one of the bedroom doors from the outside, but contended that it was to keep certain of the children from tampering with the others' belongings. He denied the doors were ever locked while the children were in the rooms. R. B. admitted only to "arguing" with T. B. and denied any domestic violence. He admitted to drinking four to six beers nightly, but denied that his drinking affected his parenting. He admitted that he and T. B. spanked the children with their hands, but denied use of any implements. He denied knowledge of any physical or emotional abuse or threats by T. B., other than her threats to "smack the kids' ass" if they didn't return

---

[8] The investigator who investigated the initial allegations asserted by respondents' former foster child, S. T., also testified, but indicated that his investigation was limited to S. T.'s allegations, which were unsubstantiated. He made clear that investigation of issues involving the other children were outside of his charge for that particular investigation. Further, he did not interview any of the subject children outside of the presence of respondents.

[9] Respondents offered three of their friends as "character" witnesses and each testified that they had not observed and did not believe any allegations of abuse and/or neglect by respondents. The circuit court noted, however, that each "testified to limited observation of the home," and therefore "afford[ed] little weight to their testimony."

to bed.  R. B.'s lone concession was that his arguments with T.B. caused emotional harm to the children, "if you look back to what they've been through growing up."

T. B. similarly denied any wrongdoing and offered differing explanations for the specific allegations of abuse.  For example, she denied ripping off E.G.B.'s clothing; she insisted that she merely assisted E.G.B. in taking off her cheerleading uniform, but that E.G.B. was upset and came into the kitchen before putting on other clothes.  She denied "forcibly" making her take her medication, explaining that she merely "coached" her through it, otherwise she would spit it across the floor.  She denied that she pulled E.G.B. by the hair and insisted that she suffered from alopecia, a medical condition causing hair loss.  She denied threatening the children if they spoke with CPS, but admitted she instructed the children not to speak to two specific school employees who she alleged had "manhandled" N.B.B.  Further, T. B. insisted that N.B.B. was merely afraid of water and that N.B.B. was not attempting to accuse her of "drowning" her, but rather could not properly articulate the word "grounding."  Finally, T. B. denied the existence of anything other than a "tiny little hook lock" on the doors that E.G.B. could easily access, and insisted the locks were actually on the *inside* of the door.[10]  She denied treating the children unequally in terms of food, clothing or belongings.

---

[10] This is inconsistent both with the photographs and testimony regarding the locks by Ms. Ruppert and the testimony of R. B.

Importantly, in addition to the above denials and explanations, T. B. testified that neither she nor her husband had committed any acts of abuse or neglect:

Q.   And, [T. B.], do you think that you did anything wrong that led to the removal of the children here?

A.   No, I don't.

Q.   Do you think your husband did anything wrong whatsoever?

A.   No, I don't.

T. B. testified that she did not believe she needed services, but would accept them. At the close of the evidentiary hearings on adjudication, the circuit court *again* denied supervised visitation to respondents.[11]

On September 5, 2018, the court entered an order adjudicating respondents as abusive, pursuant to West Virginia Code § 49-4-601(i) (2015). The court's order reiterated much of the *in camera* testimony of the children, again noting that it found their testimony credible, corroborated by each other and their reports to CPS and DHHR, and that the denials of the respondents were "contradicted in significant part by the credible testimony of the Children." The court concluded that respondents inflicted 1) "substantial

---

[11] Initially, DHHR did not offer any services to respondents because of their refusal to accept responsibility, *see* text *infra*; however, on June 21, 2018, the court granted respondents' motion that services be provided and they began attending parenting and life skills classes offered by Children First.

mental or emotional injury"[12]; 2) that R. B.'s alcohol abuse "has impaired his parenting skills to a degree as to pose a risk to the Children's health or safety"; and 3) that there were "ongoing occurrences of domestic violence in the home such that the health, life, or safety of the Children was threatened."

Subsequent to the adjudicatory hearings, the circuit court ordered respondents to undergo psychological evaluations of parental fitness. With respect to T. B., the evaluation noted that she blamed the family's involvement in the abuse and neglect proceedings on a former foster child, S. T., who "threatened her";[13] she denied all of the

---

[12] Despite reiterating and taking "judicial notice" of the children's testimony regarding physical abuse and repeatedly finding their testimony as a whole credible, the circuit court did not find the allegations of physical abuse proven by clear and convincing evidence. The circuit court failed to provide an explanation for this inconsistency.

[13] As previously referenced, allegations made against respondents T. B. and R. B. were made by S. T., after she had left respondents' home at their request, following an incident in which she had threatened to shoot up her school. While the investigation into S. T.'s allegations were unsubstantiated, in the course of that investigation, the allegations regarding the six other children were raised, precipitating the instant petition. In short, although allegations made by S. T. did initially bring the respondents' family to the attention of CPS, it was the disclosures made by the respondent children, not the allegations made by S. T., that resulted in the filing of this abuse and neglect proceeding.

Throughout these proceedings, respondents insist that the allegations of the children were temporally limited to the time period shortly before S. T. became more troubled and ultimately left the home. Respondents contend that S. T. broke up with a boyfriend and began "cutting" and threatening the school. They further contended that S. T. became angry at them for failing to appear at a hearing in her proceedings and sent them threatening letters. Respondents strongly suggested that the entirety of the instant proceedings were precipitated by S. T.'s desire for revenge.

9

specific allegations made by the children in their *in camera* testimony; and she "denied any other concerns that CPS might have regarding her parenting." The psychological evaluation of T. B. concluded:

> *Failure to acknowledge past child maltreatment is always a significant risk factor for future maltreatment.* Given [T. B.'s] *denial*, her *defensive responding in the current evaluation*, her poor motivation for treatment, and the dangerousness of some of the reported physical abuse, prognosis for the reliable attainment of minimally adequate parenting within the typical timeframe of this type of case is currently assessed to be poor. The recommendations below are for her own benefit and for use if reunification must be attempted, though we would caution against undertaking any such effort in this case. *It is not likely that the recommended interventions will facilitate the reliable attainment of minimally adequate parenting.*

(emphasis added).

With respect to R. B., the evaluation showed that he too blamed the family's involvement in the proceedings on the former foster child, S. T., denied any psychological or physical abuse of the respondent children, and denied any knowledge of such abuse perpetrated by his wife. He reported that he drank four to five 12-ounce beers per day and that he had one DUI arrest, but "minimized his problems with alcohol [and] denied significant negative consequences of use." The psychological evaluation of R. B. concluded:

---

Although the record is peppered with these allegations, there is little substance contained in the appendix record to give them much, if any, context or credibility. Aside from a brief reference in the dispositional order, the circuit court did not apparently give these allegations much consideration.

> Prognosis for the reliable attainment of minimally adequate parenting within the typical timeframe of this type of case is currently assessed to be poor, largely due to *denial of the referral concerns*, chronic alcohol abuse and apparent minimization of the same, poor motivation for treatment, and defensive responding in the current evaluation. The recommendations below are for his personal benefit and for use if reunification must be attempted, but are *unlikely to facilitate the reliable achievement of minimally adequate parenting*.

(emphasis added).

On November 1, 2018, the court held a dispositional hearing. The DHHR indicated that it was seeking termination because respondents had continued to deny wrongdoing and the children did not wish to have visitation or contact with respondents. Similarly, the guardian ad litem submitted a report which recommended termination and that post-dispositional improvement periods be denied. In support of her recommendation, the guardian noted 1) the psychological evaluations of respondents indicating poor prognosis; 2) respondents' continued "problems with acceptance of responsibility"; 3) respondents' previous receipt of extensive PRIDE[14] training prior to their adoption of the children, suggesting additional services would be pointless; 4) the children's length of time in foster care[15] and unrelenting exposure to abuse and neglect throughout their short lives.

---

[14] PRIDE ("Parent Resources for Information, Development, and Education") training utilizes curriculum developed by the Child Welfare League of America and is a necessary prerequisite to foster parenting or adoption in West Virginia. *See* www.wvfact.com (last visited November 14, 2019).

[15] The guardian noted that the children had been in foster care for eleven months as of the time of her report and that an improvement period would extend their time there beyond the fifteen month limitation under West Virginia Code § 49-4-610(9) (2015).

The guardian unequivocally expressed that the children were doing well in their placements and that their best interests would be served by remaining in those placements.

Kimberly Morris, respondents' service provider, testified that they had not missed any sessions and that their *compliance* had been "exemplary." However, Ms. Morris testified that T. B. and R. B. still refused to accept responsibility for the allegations made by the children:

> They have not said that they accept responsibility. They believe that a lot of this has been blown out of proportion and the allegations aren't true, is what they tell me. There are some things that we discussed that they will say "I never saw it like that," "maybe I was too harsh," or "maybe I was too negative." But as far as the allegations, I believe they believe—they've told me that they are untrue.

Ms. Morris agreed that respondents' "position" on the allegations could prove to be a barrier to continued services.

In this regard, respondents continued to characterize themselves as "overwhelmed" at the time of the petition in large part due to the behavior of S. T., as well as the death of a granddaughter. Both testified services had been "helpful," and in particular, T. B. agreed that she had been "overly harsh" and "negative" toward the children. R. B. testified that he was willing to undergo treatment for alcohol abuse. Both respondents indicated willingness to comply with any services required.

On November 1, 2018, the circuit court issued an order granting respondents a six-month post-adjudicatory improvement period. Citing the above testimony, the court found that respondents "have acknowledged wrongdoing and accepted responsibility for their actions that led to the filing of the Petition[.]" The court further found that respondents were "likely to fully participate in an improvement period." The court did not address the findings contained in respondents' psychological evaluations. The court noted that the wishes of the children were not dispositive, noting that only A.D.M., who did not want reunification or even visitation, was over the age of fourteen, and that E.G.B., whose testimony aligned with that of A.D.M., "is not well-equipped to take part in the decisions of this case" due to "several factors" which the court did not identify.[16] Finally, the court appeared to take particular issue with DHHR's request for termination, citing its "continuous" objection to visitation, failure to provide services until six months after the petition was filed, and reliance on the children's wishes. This writ of prohibition followed.[17]

---

[16] The court's order does, however, cite to a portion of the adjudicatory transcript wherein E.G.B.'s removal from a foster home at the request of the foster parents was discussed.

[17] The DHHR and guardian ad litem initially attempted a direct appeal of the circuit court's order. On February 7, 2019, an order refusing to docket the parties' joint notice of appeal was issued, but staying the circuit court's disposition for sixty days to permit the DHHR and guardian ad litem to pursue the instant writ.

## II. STANDARD OF REVIEW

The factors necessary for issuance of a writ of prohibition are well-established:

> In determining whether to entertain and issue the writ of prohibition for cases involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). In *State ex rel. Amy M. v. Kaufman*, 196 W.Va. 251, 470 S.E.2d 205 (1996), this Court granted a writ of prohibition in a child abuse and neglect proceeding, recognizing that "'[o]ur modern practice is to allow the use of prohibition, based on the particular facts of the case, where a remedy by appeal is unavailable or inadequate, or where irremediable prejudice may result from lack of an adequate interlocutory review.'" *Id*. at 257, 470 S.E.2d at 211 (quoting *McFoy v. Amerigas, Inc*., 170 W. Va. 526, 532, 295 S.E.2d 16, 22 (1982)); *see also State ex rel. J.E.H.G. v. Kaufman*, No. 16-0931, 2017 WL 526398, at *3 (W. Va. Feb.

14

8, 2017) (memorandum decision) (approving use of prohibition "in order to protect the best interests" of the child).

Generally, the decision to grant or deny an improvement period is an act within the discretion of the circuit court.[18] However, a discretionary act is certainly not immune from the extraordinary remedy of a writ of prohibition. In particular, our mandate that abuse and neglect matters be predominated by the best interests of the child grants this Court more than adequate procedural and substantive authority to review such matters.

This Court has not hesitated to grant extraordinary relief when the circuit court has so misapprehended the evidence or law in its allowance of an improvement period such that it has jeopardized a child's well-being, best interests, or right to permanency. *See J.E.H.G.*, 2017 WL 526398, at *4 (granting writ of prohibition precluding improvement period and rejecting argument that issue is "one which simply involves 'judicial discretion'"); *State ex rel. P. T. v. Wilson*, No. 12-1489, 2013 WL 645815, at *5 (W. Va. Feb. 21, 2013) (memorandum decision) (granting writ of prohibition for failure to consider best interests in granting dispositional improvement period). As the Court has previously observed: "Discretion granted to the circuit court within [the abuse and neglect] framework is intended to allow the court to fashion appropriate measures and remedies to highly

---

[18] *See* Syl. Pt. 6, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("It is within the court's discretion to grant an improvement period within the applicable statutory requirements . . . .").

complex familial and inter-personal issues—it does not serve as a blanket of immunity for the circuit court[.]" *In re J. G.*, 240 W. Va. 194, 204, 809 S.E.2d 453, 463 (2018); *see also In re Isaiah A.*, 228 W. Va. 176, 185, 718 S.E.2d 775, 784 (2010) (reversing grant of improvement period where "factual record, the best interests of the child, and the child's right to eventual permanency" warrant termination).

With these standards in mind, we turn to the parties' arguments.

## III. DISCUSSION

Although parents have substantial rights that must be protected, as this Court has recognized in our jurisprudence for decades, parental rights are subordinate to the best interests of the children: "[T]he 'best interests of the child' . . . . has become the ultimate benchmark by which all custody decisions are appraised. While this Court has also observed that the rights of the parents are entitled to respect and protection, the rights of the children are paramount[.]" *In re Frances J.A.S.*, 213 W. Va. 636, 643, 584 S.E.2d 492, 499 (2003) (quoting *Bowens v. Maynard*, 174 W. Va. 184, 186, 324 S.E.2d 145, 147 (1984)). *See Katie S.*, 198 W. Va. at 87, 479 S.E.2d at 597 ("[T]he primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children."); *see also In re A.N. and C.N.*, 241 W. Va. 275, __, 823 S.E.2d 713, 721 (2019) (same); *In re Cecil T.*, 228 W. Va. 89, 98, 717 S.E.2d 873, 882 (2011) (same).

16

Our growing insistence over the last two decades that the best interests of the child must be paramount has resulted in a marked shift away from the older emphasis on reunification at any cost as the preeminent goal in abuse and neglect cases. As this Court recently stated, "[i]t is critically important to note the changes that our abuse and neglect laws have undergone, particularly as pertains to the goal of reunification and the importance of the role of concurrent planning for permanency." *State ex rel. C. H. and S. H. v. Faircloth*, 240 W. Va. 729, 741, 815 S.E.2d 540, 552 (2018). We explained that,

> Certainly the over-arching purpose of our abuse and neglect statutory construct continues to be the correction of conditions of abuse and neglect and the return, if reasonably possible, of the children to their homes. However, reunification is no longer viewed as an 'at all costs' goal. Instead, the Court has recognized that the aim of reunification does not require the courts to test the boundaries of opportunity provided to parents during the improvement periods.

*Id.*; *see also In re: Charity H.*, 215 W. Va. 208, 215, 599 S.E.2d 631, 638 (2004) ("[R]ather than presuming the entitlement of a parent to an improvement period . . . the law now places on the parent the burden of proof regarding whether an improvement period is appropriate."); Syl. Pt. 1, in part, *In re R. J. M.,* 164 W. Va. 496, 266 S.E.2d 114 (1980) ("[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened[.]").

Synthesizing the development of abuse and neglect law in its progression away from the parental entitlement paradigm, we emphasized that "*only* when reunification

17

fully serves the best interests of the child do statutorily required efforts to reunite the family dovetail with the goal of abuse and neglect proceedings." *C. H.*, 240 W. Va. at 741, 815 S.E.2d at 552 (emphasis in original). Concomitantly, "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W. Va. Code, 49-6-5 [1977], may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W. Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 1, *In re Jeffrey R. L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993).

With dramatically increasing numbers of children being removed from their homes as the result of abuse and neglect, West Virginia's child protective services system faces an immense challenge. Even though this Court only sees the tip of the iceberg of West Virginia's abuse and neglect cases, they now constitute at least twenty-five percent of our docket.[19] Many of these cases are replete with failures of the DHHR to live up to their responsibilities, not only to protect children who are abused and/or neglected, but to address these children's individualized special needs which are often related to or the result of the abuse and/or neglect. Recognizing that the child protective services resources are spread thin, the Court has refrained from frequent vocal criticism of the DHHR's failures.

---

[19] Statistics as of 2018. *See* http://www.courtswv.gov/supreme-court/clerk/statistics/17-18QuickFacts.pdf.

18

The instant case, however, presents one of the most aggravated failures of the state's child protective services' mission.[20]

With this perspective in mind, we turn now to petitioner's contention that the circuit court erred in granting respondents an improvement period. The crux of this case is whether respondents demonstrated by clear and convincing evidence that they are likely to fully participate in an improvement period and that such improvement period is likely to remediate the issues of abuse which led to their adjudication. More importantly, we must determine whether such an improvement period jeopardizes the best interests of the children. Petitioners contend that the circuit court failed altogether to consider the best interests of the children, hinging its disposition narrowly on minimal acknowledgement of

---

[20] The parental rights of these children's biological parents were terminated as a result of abuse and/or neglect. Unfortunately, there is nothing in the record to indicate when that termination occurred, the basis for the termination, how many foster homes the children have been in prior to placement with the petitioners, or any other information that would have been helpful in providing a picture of the extent of what these children have suffered. *See* n.2, *supra*. Suffice it to say, however, as R. B. testified, the children have been "in and out of the system their entire lives."

Given that the children had already been removed from their biological parents due to abuse and/or neglect, it should have been incumbent on the DHHR to throw all of its resources into action to find placements for these children which could provide basic nurturance, safety, and healing. Instead, it effectively forced a family that tried to tell adoption officials it was already too overwhelmed by the children in their custody to take on additional children with special needs by telling respondents that they would not receive any more children in the future if they "returned" these children. *See* discussion, *supra*.

At their young ages, these children have been battered about in a system whose mission it was to protect them but which instead re-victimized them. These children deserve so much better. They deserve a chance to be healthy, happy, nurtured and loved and protected. They have a right to have their special needs and problems addressed.

wrongdoing finally offered by the respondents and their empty assurances that they would improve if given the opportunity and provided adequate services. Respondents rail against the DHHR's lack of reunification efforts and insist that they adequately acknowledged their limited wrongdoing, such that an improvement period is warranted.

We begin with the statutory authority for the circuit court's imposition of an improvement period in lieu of one of the other alternative dispositions permitted under West Virginia Code § 49-4-604. This Court has made clear that improvement periods are "regulated, both in their allowance and in their duration, by the West Virginia Legislature, which has assumed the responsibility of implementing guidelines for child abuse and neglect proceedings generally." *In re Emily*, 208 W. Va. 325, 334, 540 S.E.2d 542, 551 (2000). West Virginia Code § 49-4-610 governs improvement periods and distinguishes between pre-adjudicatory, post-adjudicatory, and post-dispositional improvement periods. While respondents made motions for post-adjudicatory improvement periods, those motions were not considered until the dispositional hearing; at this hearing, DHHR and the guardian ad litem requested termination of respondents' parental and guardianship rights. Moreover, the circuit court's order is entitled "Disposition Order."[21] Accordingly, the Court will treat the improvement periods as dispositional, rather than post-adjudicatory;

---

[21] West Virginia Code § 49-4-604(d) provides, in pertinent part, that "[t]he court may, as an alternative disposition, allow the parents or custodians an improvement period not to exceed six months. During this period the court shall require the parent to rectify the conditions upon which the determination was based."

however, for all intents and purposes the statutory requirements and our law treat them virtually identically.

West Virginia Code § 49-4-610, which governs improvement periods, provides, as pertains to a post-dispositional improvement period:

> (3)     *Post-dispositional improvement period*--The court may grant an improvement period not to exceed six months as a disposition pursuant to section six hundred four of this article when:
>
> (A) The respondent moves in writing for the improvement period;
>
> (B) *The respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period* and the court further makes a finding, on the record, of the terms of the improvement period;

(emphasis added).  However, given that the best interests of the child must always prevail, the Court has also recognized that "a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period. For example, when the award of an improvement period would jeopardize the best interests of the subject child, the parent requesting such relief ordinarily will not be accommodated." *Emily*, 208 W. Va. at 336, 540 S.E.2d at 553; *see also Charity H*., 215 W. Va. at 216, 599 S.E.2d at 639 ("Both statutory and case law emphasize that a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period.").  Moreover, "when a parent cannot demonstrate that he/she will be able to correct the conditions of abuse and/or neglect with which he/she has been charged, an improvement period need not be awarded before the

21

circuit court may terminate the offending parent's parental rights." *Emily,* 208 W. Va. at 336, 540 S.E.2d at 553.

As pertains to this particular case, this Court has made clear that "in order to remedy the abuse and/or neglect problem, the problem must first be acknowledged." *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010). This is so because "[f]ailure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect . . . results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense." *Id*. (citing *W. Va. Dep't of Health and Human Res. v. Doris S.*, 197 W. Va. 489, 498, 475 S.E.2d 865, 874 (1996)); *see also Isaiah*, 228 W. Va. 176, 718 S.E.2d 775 (reversing and remanding for failure to terminate parental rights where respondent mother denied having a drug problem).

In view of the record as whole, it is clear that the circuit court failed to consider probative evidence and the informed recommendations of DHHR and the guardian ad litem, misapprehended the evidence of respondents' "acknowledgement" of their wrongdoing, and ultimately failed altogether to consider the best interests of the children in granting an improvement period. While the circuit court's order is certainly replete with citations to our ample body of law and devotedly tracks the language of the statute regarding improvement periods, we find that it fails on its face to fully evaluate and

consider what may be some of the most compelling evidence in the case and is devoid of any analysis of the children's best interests.

First, we note that the circuit court's order makes no mention whatsoever of the results of respondents' court-ordered psychological evaluations, which found respondents completely lacking in insight and acknowledgement of the startling abuse allegations in this case.[22] The evaluations plainly and unequivocally find that even the provision of services is "unlikely to facilitate the reliable achievement of minimally adequate parenting" due to their denial of the allegations, defensive posturing, and lack of motivation for treatment.[23] In fact, as to reunification with T. B., the psychologist indicated he "would caution against undertaking any such effort in this case." As to R. B., the report noted minimization not only of the allegations, but of his alcohol abuse as well—one of the primary allegations against him individually.

Secondly, the circuit court's order makes no mention whatsoever of the written recommendations of the guardian ad litem. This is particularly noteworthy given that the parties did not engage in closing remarks at the end of the dispositional hearing;

---

[22] The circuit court's order notes only that respondents "participated in" the evaluations.

[23] Per the psychological evaluation, T. B. denied all of the specific allegations made by the children; she "denied any other concerns that CPS might have regarding her parenting"; and continually focused all of the blame for her situation on a former foster child, S. T.

instead, the court requested proposed findings and therefore did not hear directly from the guardian ad litem at the dispositional hearing regarding her recommendations. As previously indicated, the guardian ad litem submitted a report which strenuously recommended against an improvement period and quite compellingly set forth her reasoning: respondents' lack of acknowledgement of wrongdoing, their psychological evaluations, their previous parenting training and services prior to the adoptions, and the length of time the children had already been in foster care. Moreover, the guardian ad litem—one of the few people with *sustained* contact with the subject children throughout the nearly one-year of proceedings—stated that the children did not want to return to respondents' home.[24]

---

[24] The circuit court's order mentions *only* Ms. Bailey's representation about the children's desire not to return the home, and not the representations made by the guardian ad litem in her report. The circuit court, on the sole basis of the nearly one-year old *in camera* testimony of the children (taken shortly after they were removed from the home), disputed the contention that *none* of the children wished to return. However, had the court desired more current or clarified information regarding their wishes, it certainly did not make that inquiry of the guardian ad litem in the transcript of the proceedings contained in the appendix record. Nor did the court seek additional *in camera* testimony from the children after this extended period of time.

That said, however, we note further the incongruity in the circuit court's handling of the children's preferences. While obviously not dispositive, the circuit court appeared to discount the older children's desire to have no further contact with respondents due to the younger children's desire to either visit with or return to respondents' care—dismissing the former yet crediting the latter. While our abuse and neglect statutory scheme permits consideration of the preferences of children of fourteen or older to express a preference as to *termination* of parental rights, *see* W. Va. Code § 49-4-604(6)(C), it does not permit deference to those preferences as to placement determinations on the scale of our domestic relations statutes. *See* W. Va. Code § 48-9-206(a)(2) (permitting consideration of "firm

24

Perhaps most importantly from an evidentiary standpoint, we find the circuit court's characterization of respondents' "acknowledgement" of their wrongdoing to be utterly unsupportable. The circuit court's order states that respondents "credibly testified that they accept responsibility for their misgivings and acknowledge that their parenting caused harm to the Children and needs improvement." In view of the gravity of the allegations in this case, we simply cannot agree that respondents' testimony reveals even a basic appreciation for the harm which respondents have caused these children or the wholesale inappropriateness of their parenting and treatment of the children.

The circuit court's order notes R. B.'s admission that the "arguments" with T. B. caused emotional harm and T. B.'s characterization of her parenting as "overly harsh" and "negative." This is the furthest degree to which either respondent took ownership of their actions. The children in this case—*all of whose testimony the circuit court repeatedly*

and reasonable" preference of child of fourteen or older or of sufficient maturity as to custodial allocation); *but cf. In re T. M. and S. M.*, No. 19-0068, 2019 WL 5875222 (W. Va. Nov. 4, 2019) (instructing on proper use of custodial allocation statutes upon post-adjudicatory dismissal of abuse and neglect petition).

The reason for this is patent. In many instances, even children who have been the subject of abuse and/or neglect may wish to return to what is often the only home they have known. Children—particularly those of tender years—are often of inadequate development and/or maturity to recognize that the familiarity (and therefore "comfort") of even an abusive or neglectful home is not as important as ensuring their immediate and long-term physical and psychological well-being. For this reason, it is the duty of the court to consider the preferences of a child with circumspection. The court must view expressions of preference through the appropriate lens and consider the child's perspective, recognizing that their acute emotional demands may not be probative as to either the credibility of the underlying allegations or their best interests.

*declared to be credible*—expressed unconscionable physical and emotional abuse at the hands of parents who were supposed to provide refuge from the (multiple) abusive and neglectful homes they had already escaped.  And yet despite being adjudicated abusive and having received services for several months prior to the dispositional hearing, respondents continued to deny the allegations, minimize their behaviors, and transfer blame to a different foster child:

> Q.    What do you believe you've done wrong here?
>
> A.    I believe it just got out of proportion.  I believe where S. T. moved in and she's doing that stuff with the school, it just escalated and it just overwhelmed me.
>
> * * *
> Q.    So the situation is S. T.'s fault?
>
> A.    It started there, yes.
>
> * * *
> Q.    [R. B.], we've heard a lot about what S. T. did wrong. What do you think you did wrong?
>
> A.    Like I said, I got overwhelmed at the end.  I let things get out of proportion.  I should have stepped back and— —just stepped back and looked toward the situation before I done anything.[25]

(Footnote added).


Perhaps worse is T. B.'s minimization of her treatment of the children.  T. B. stood *credibly* accused—as per the circuit court's assessment of the children's

---

[25] What R. B. is referring to here is unclear given his previous adamant denial that any of allegations of behaviors against the children were true.

allegations—of threatening to "snap" a certain child's neck, locking at least two children in their rooms overnight, depriving certain of them of personal belongings and food, frightening them with frequent physical domestic violence, and threatening them if they disclosed the abuse. However, when asked to express how the parenting services have helped, T. B. stated simply: "It's opened our eyes up on how the kids may take how we, you know, speak. Especially me, because it's the way I talk. *May take it the wrong way*." (emphasis added). As to the admitted emotional harm caused by her contentious, if not violent, relationship with R. B. and her abuse of the children, T. B. again minimized their conduct:

> Yeah, me and [R. B.] argue. Yeah it gets out of control sometimes. We yell, it gets loud. You know, yeah, they don't go to bed at night. Yeah, I'll holler, you know, get back to bed or I'm going to whoop your ass. It's just a word, it doesn't mean I'm going to do it. I've only smacked my kids on the hind end a few times and that's only when it was messing with stoves or something like that, and it was never hard enough to do anything. Just to let them know that's something you don't do. I love my kids. A tiny little hook latch does not go to the chains. It's a little hook for [E.G.B.]. It's a lock for [N.B.B.], not to lock the kids up.

These colloquies are particularly startling given T. B.'s ultimate concession at the dispositional hearing—even in the face of the prior consistent denials to their psychologist, service provider, DHHR, and the court—that the adjudicated facts were, in fact, true:

> Q. So are you aware of what the children reported was going on in the home?

A.  Yes.

Q.  And you've also had a chance to look at the adjudication order in this case; is that right?

A.  That's correct.

Q.  Are the things in the kids' testimony and in the adjudication order; is that true?

A.  Well, I ——I'd say yes.

The testimony in this case makes our observation in *Timber M.*, particularly profound: "[I]n order to remedy the abuse and/or neglect problem, the parent must recognize and acknowledge that his or her conduct *constituted abuse*." 231 W. Va. at 55, 743 S.E.2d at 363 (emphasis added). *See also In re J. R.-1*, No. 16-0609, 2016 WL 6679018, at *3 (W. Va. Nov. 14, 2016) (memorandum decision) (finding that "denial of wrongdoing" and parent's prior claims that he "did not require any further 'change' or 'improvements or services'" warranted denial of improvement period).

This Court has previously upheld the denial of an improvement period on the basis of precisely these factors. In *In re M. M.*, 236 W. Va. 108, 778 S.E.2d 338 (2015), an abuse and neglect petition was brought alleging that the step-father "verbally abused [a child] at [a] basketball game, . . . disciplined the children by requiring them to stand in the corner for hours at a time, . . . curse[d] at the children, and that he and [the mother] yell and curse at each other in the children's presence." *Id.* at 118, 778 S.E.2d at 348. This Court found that "because the emotional abuse perpetrated on their children created a degree of family stress and potential for further abuse which precluded the use of further

28

resources to resolve the family's problems," an improvement period was not appropriate. *Id*. In finding the denial of an improvement period proper, this Court cited the history of past abuse of the children, the testimony of the children "detailing the major dysfunctional relationships and chaotic life at home," the service provider's testimony, and the psychological evaluations showing "that the mother had a 'guarded' prognosis and the step-father had a 'very guarded' prognosis." *Id*. at 116, 778 S.E.2d at 346. *See also In re M. R*., No. 18-1065, 2019 WL 2246095, at *4 (W. Va. May 24, 2019) (memorandum decision) (affirming refusal to grant improvement period where parent minimized circumstances of abuse and neglect and psychological evaluation found poor prognosis to attain minimally acceptable parenting).

Further, we find both the circuit court and respondents, improperly preoccupied with respondents' insistence that they will comply with services, ignored their obvious failure to internalize the gravity of the allegations and proceedings. While respondents tout Ms. Morris's testimony deeming their compliance with services as "exemplary," they disregard her more critical testimony regarding their continued failure to benefit from those services, *i.e*. their refusal to concede parental inadequacies on any meaningful scale. We have long recognized that "it is possible for an individual to show 'compliance with specific aspects of the case plan'" while failing "to improve . . . [t]he overall attitude and approach to parenting." *W. Va. Dept. of Human Servs. v. Peggy F*., 184 W.Va. 60, 64, 399 S.E.2d 460, 464 (1990).

29

More importantly, the circuit court failed to take note of the highly pertinent observation of the guardian ad litem as pertained to services: respondents have already undergone intensive services and training in order to foster or adopt the children in the first instance. This Court has frequently found improvement periods futile and therefore improper where parents have previously received services, yet continue their behaviors unabated. *See In re J. A.*, __ W. Va. __, 833 S.E.2d 487, 495 (2019) (finding prior services from DHHR made denial of improvement period proper); *In re K. C.*, No. 18-1008, 2019 WL 1766072, at *3 (W. Va. Apr. 19, 2019) (memorandum decision) (upholding denial of improvement period where parent was previously provided services); *M. M.*, 236 W. Va. at 115, 778 S.E.2d at 345 (affirming denial of improvement period where "attitudes toward parenting have not changed during their participation in services to this point").

"The goal of an improvement period is to facilitate the reunification of families *whenever that reunification is in the best interests of the children involved*." *Amy M.*, 196 W. Va. at 258, 470 S.E.2d at 212 (emphasis added). As such, the circuit court's criticism of DHHR's recommendations on visitation and belated provision of services, are frankly beside the point.[26] The best interests of the children must predominate in any

---

[26] DHHR made clear that it initially objected to visitation due to the children's specifically expressed concerns that T. B. had threatened them if they reported any abuse to school officials or CPS. Thereafter, the circuit court twice denied supervised visitation, taking the matter completely out of DHHR's hands.

As to the provision of services, DHHR made equally clear that given respondents' refusal to acknowledge any wrongdoing, it did not believe services appropriate or

determination of the propriety of an improvement period, irrespective of the purported misssteps of DHHR or demands for additional support by recalcitrant parents: "A parent's rights are necessarily limited in [regard to improvement periods] because the pre-eminent concern in abuse and neglect proceedings is the best interest of the child subject thereto." *Emily*, 208 W. Va. at 336, 540 S.E.2d at 553.

That said, we question whether the provision of services was required in this case under any circumstances, much less serves as a means to allow respondents to prolong the proceedings. West Virginia Code § 49-4-602(d) (2015) specifically provides that the Department "is not required to make reasonable efforts to preserve the family if the court determines: (1) the parent has subjected the child[ren] to aggravated circumstances which include, but are not limited to, abandonment, torture, *chronic abuse* and sexual abuse." (emphasis added). This Court has found that "reasonable efforts, such as services provided by the DHHR in an improvement period, are not required if there are aggravated circumstances[.]" *In re S. M.*, No. 11-1080, 2012 WL 2874145, at *2 (W. Va. Jan. 18, 2012) (memorandum decision); *see also M. R.*, 2019 WL 2246095, at *3 (noting that

---

necessary. While best practices might suggest a less discriminating and more uniform approach to the provision of services, in this particular case, we agree that the absence of more robust services provides respondents no relief. Moreover, as per Ms. Bailey's testimony, at no time prior to the dispositional order were respondents ever under an improvement period, during which time services are typically provided.

31

"aggravated circumstances" obviates need for provision of services); *In re D. N.*, No. 14-0465, 2014 WL 4686106, at *3 (W. Va. Sept. 22, 2014) (memorandum decision) (same).

While DHHR indicated below that it did not consider this case one of "aggravated circumstances,"[27] we wholeheartedly disagree.  The extent of abuse credibly described by the children and as judicially noticed by the circuit court plainly smacks of "chronic abuse."  In short, the outcome of this case is mandated by the severity of the abuse suffered by the children and respondents' intransigence in denying and refusing to accept responsibility, not by any alleged procedural failure on the part of DHHR.

While our above discussion of the factual underpinnings of this case alone lead us inexorably to the conclusion that the circuit committed a clear error, we find that the most acute failure of the circuit court's order granting an improvement period is the complete absence of any analysis of the children's best interests.   While West Virginia Code § 49-4-610 does not expressly incorporate a best interests analysis into the threshold requirements for the grant of an improvement period, our caselaw certainly does.  "A parent's right to an improvement period is carefully defined because the pre-eminent concern in abuse and neglect proceedings is the best interest of the child subject thereto." *Charity H.*, 215 W. Va. at 216-17, 599 S.E.2d at 639-40.  As previously observed, the

---

[27] *See In re G. R.*, No. 15-1200, 2016 WL 1456168, at *4 (W. Va. Apr. 12, 2016) (memorandum decision) (finding aggravated circumstances despite DHHR's testimony that it did not consider case one of aggravated circumstances).

*Emily* Court made clear that "a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period. For example, when the award of an improvement period would jeopardize the best interests of the subject child . . . ." 208 W. Va. at 336, 540 S.E.2d at 553; *see also Charity H.*, 215 W.Va. at 216, 599 S.E.2d at 639 ("Both statutory and case law emphasize that a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period.").

We therefore hold that compliance with the statutory requirements contained in West Virginia Code § 49-4-610 does not unconditionally entitle a parent to an improvement period. Only where such an improvement period does not jeopardize a child's best interests should one be granted and the circuit court's order granting an improvement period should set forth findings demonstrating the lack of prejudice or harm to the child. Particularly where, as here, the DHHR, the guardian ad litem, and the psychological experts all adamantly oppose an improvement period, it is incumbent upon the circuit court to demonstrate the propriety of such an improvement period in light of the children's best interests—not merely rote compliance with the threshold statutory factors.

Our review of the record firmly convinces us that an improvement period is in no way in the children's best interests, particularly where the abuse was serious and sustained, at least some of the children have expressed their desire to have no visitation, let alone reunification, where all of the children are doing well in their current placements,

and, critically, where respondents are unwilling to admit wrongdoing to any meaningful degree.

As this Court has stated, "the aim of reunification does not require the courts to test the boundaries of opportunity provided to parents[.]" *C. H.*, 240 W. Va. at 741, 815 S.E.2d at 552. Respondents herein have wholly failed in their burden to "demonstrate that [they] will be able to correct the conditions of abuse and/or neglect with which [they] ha[ve] been charged[.]" *Emily,* 208 W. Va. at 336, 540 S.E.2d at 553. In view of the abundant evidence of respondents' continued denial of any wrongdoing and what the circuit court has unequivocally deemed to be the credible allegations of the children, we do not hesitate in issuing a writ of prohibition to preclude the award of an improvement period.

Moreover, we find that mere issuance of the writ would only permit this fully developed case to languish further and perpetuate the delay in permanency that these children have been seeking nearly their entire lives.[28] "Ensuring finality for these children

---

[28] As the guardian ad litem noted, the children have now been in foster care for nearly twenty-two months. West Virginia Code § 49-4-610(9) provides:

> Notwithstanding any other provision of this section, no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months, unless the court finds compelling circumstances by clear and convincing evidence

34

is vital to safeguarding their best interests so that they may have permanency and not be continually shuttled from placement to placement." *In re Cesar L.*, 221 W. Va. 249, 258, 654 S.E.2d 373, 382 (2007). As noted above: "Termination of parental rights . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 1, *Jeffrey R. L.*, 190 W. Va. 24, 435 S.E.2d 162.

In light of our conclusion that respondents have failed to establish their qualification for a dispositional improvement period, termination of respondents' parental and custodial rights is inevitable. Accordingly, we direct the circuit court to enter an order terminating respondents' parental and custodial rights as to all children and comply with our statutory and procedural guidelines to ensure the achievement of permanency for the children.[29] *See J. G.*, 240 W. Va. at 205-06, 809 S.E.2d at 464-65 (finding "vacation of

that it is in the child's best interests to extend the time limits contained in this paragraph.

[29] Upon termination of respondent's parental and custodial rights, the circuit court should likewise entertain appropriate motions and/or consider whether post-termination visitation is warranted in this case. This determination is governed by Syllabus Point 5 of *In re Christina L.*, 194 W. Va. 446, 448, 460 S.E.2d 692, 694 (1995):

When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make

dispositions and remand for compliance serves only to compound any pre-existing delay"
and remanding for termination of parental rights); *P. T.*, 2013 WL 645815, at *5 (granting
writ precluding improvement period and remanding with instructions to terminate parental
rights where "best interests of [child] do not support a further delay in his reaching
permanency").[30]

---

> such request. The evidence must indicate that such visitation
> or continued contact would not be detrimental to the child's
> well being and would be in the child's best interest.

Further, the circuit court and DHHR are directed to ensure that all needed services are being provided to the subject children including but not limited to any medical, psychological, or educational evaluations necessary to ensure their needs are being met. *See* W. Va. Code § 49-4-603 (a)(1) ("At any time during proceedings under this article the court may, upon its own motion or upon motion of the child or other parties, order the child or other parties to be examined by a physician, psychologist or psychiatrist . . . ."); W. Va. Code §§ 49-4-405, 408 (detailing comprehensive, individualized service plan for abused and/or neglected children). *See also In re: C. C. and M. C.*, No. 19-0322 (W. Va. Nov. 19, 2019) (memorandum decision) (directing psychological evaluations upon remand in light of psychological and behavioral issues at play and to inform issue of post-termination visitation).

During oral argument, the guardian ad litem outlined in detail the problems and special needs of each child and explained that their current placements are designed to meet these needs and offer meaningful individualized treatment and services. While they are not placed together, the guardian ad litem indicated that continued relationship among the children was being facilitated. While many of the problems and needs experienced by the children may be the result of and aggravated by years of abuse, the judiciary system must now take every necessary step to ameliorate and heal the damage suffered from the tragic experiences of their young lives.

[30] Finally, because these proceedings remain ongoing, this Court reminds the circuit court of its duty to establish permanency for the children. Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires:

# IV. CONCLUSION

For the reasons set forth above, this Court finds that the Circuit Court of Roane County's order granting respondents an improvement period is clearly erroneous as a matter of law. Because the best interests of the children do not support a further delay in their reaching permanency, we grant the requested writ of prohibition and remand this case with instructions to terminate respondents' parental and custodial rights as to all children.

Writ Granted.

---

> At least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

In this case, these should be in-depth, rather than perfunctory, reviews with detailed attention to the children's psychological and educational progress.

37